# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 2, 2020          Decided March 5, 2021

No. 08-1065

STATE OF NEW JERSEY,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AIR PERMITTING FORUM, ET AL.,
INTERVENORS

———

On Petition for Review of a Final Action
of the Environmental Protection Agency

———

*Lisa J. Morelli*, Deputy Attorney General, Office of the Attorney General for the State of New Jersey, argued the cause for petitioner. With her on the briefs was *Gurbir S. Grewal*, Attorney General. *Jon C. Martin*, Deputy Assistant Attorney General, entered an appearance.

*Laura J. Brown*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, *Jonathan D. Brightbill*, Principal Deputy Assistant Attorney General, and

*Brian L. Doster*, Assistant General Counsel, U.S. Environmental Protection Agency. *Eric G. Hostetler* and *Norman L. Rave Jr.*, Attorneys, U.S. Department of Justice, and *Howard J. Hoffman*, Counsel, U.S. Environmental Protection Agency, entered appearances.

*Shannon S. Broome* argued the cause for intervenors Air Permitting Forum, et al. in support of respondent. With her on the brief were *Laura K. McAfee*, *Charles H. Knauss*, and *Alexandra K. Hamilton*. *David M. Friedland*, *Stacy R. Linden*, *Richard S. Moskowitz*, *Harry M. Ng*, and *Michele M. Schoeppe* entered appearances.

Before: SRINIVASAN, *Chief Judge*, ROGERS and WALKER, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

Dissenting Opinion by *Circuit Judge* WALKER.

ROGERS, *Circuit Judge*: This petition for review concerns the rule promulgated by the Environmental Protection Agency ("EPA") upon remand in response to *New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005). There, states, environmental organizations, and industrial entities challenged the revision of the Clean Air Act's new source review ("NSR") program for preconstruction permitting of stationary sources of air pollution. This court held that "EPA acted arbitrarily and capriciously in determining that sources making changes need not keep records of their emissions if they see no reasonable possibility that these changes constitute modifications for NSR purposes," *id.* at 11, and remanded for EPA "either to provide an acceptable explanation for its 'reasonable possibility' standard or to devise an appropriately supported alternative," *id.* at 35–36. The State of New Jersey petitions for review on

the grounds that the rule promulgated by EPA on remand adopts an arbitrary percent trigger and inadequately accounts for NSR enforcement. Concluding that challenges to the State's Article III standing lack merit, we deny the petition on the merits because the record confirms that EPA engaged in reasoned decisionmaking.

## I.

Under the Clean Air Act ("Act"), "air pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3); *see also id*. § 7407(a); *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 308 (2014). The Act, in fact, establishes "a joint state and federal program for regulating the nation's air quality," *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1224 (D.C. Cir. 2007) (quoting *Envtl. Def. v. EPA*, 467 F.3d 1329, 1331 (D.C. Cir. 2006)), directing EPA to formulate national ambient air quality standards ("NAAQS") that specify the maximum permissible concentrations of certain air pollutants, 42 U.S.C. § 7409(b)(1), and requiring states to develop EPA approved plans, known as State Implementation Plans ("SIPs"), describing how they will achieve and maintain the NAAQS, *see id.* § 7410; *Texas v. EPA*, 726 F.3d 180, 183 (D.C. Cir. 2013). "States that fail to comply with these requirements are subject to various sanctions and the imposition of a Federal Implementation Plan ('FIP')." *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1037 (D.C. Cir. 2001) (citing 42 U.S.C. § 7509).

The new source review ("NSR") provisions of the Act apply to "major" stationary sources and emitting facilities, such as smelters, power plants, and refineries, that directly emit or have the potential to emit more than one hundred tons per year of any air pollutant. *See* 42 U.S.C. §§ 7602(j), 7479(1). NSR

4

provisions "require 'new and modified major stationary sources' of air pollution to obtain preconstruction permits and to install pollution control technology in order to protect and enhance air quality." *New York*, 413 F.3d at 21 (citing 42 U.S.C. §§ 7475, 7502, 7503). The "specific pollution control requirements depend[] upon the geographic location of the source." *New York v. EPA*, 443 F.3d 880, 883 (D.C. Cir. 2006). The prevention of significant deterioration ("PSD") provisions apply to sources located in areas that meet the NAAQS, *see* 42 U.S.C. §§ 7470–7479, while more stringent nonattainment NSR ("NNSR") provisions apply to sources in areas that do not meet the NAAQS, *see id.* §§ 7501–7515; *see also New York*, 413 F.3d at 13.

All newly constructed major stationary sources must comply with NSR requirements. For existing sources, these requirements apply only to "major" modifications that will result in (1) a "significant emissions increase" and (2) a "significant net emissions increase" of one or more regulated pollutants. *See, e.g.*, 40 C.F.R. § 52.21(a)(2)(iv). A "significant emissions increase" is defined by numeric significance levels for each regulated pollutant. *See, e.g., id.* § 52.21(b)(40). NSR requirements do not apply to routine maintenance, repair, and replacement. *See, e.g., id.* § 52.21(b)(2)(iii)(a). States are additionally required to administer programs to regulate "the modification and construction of any stationary source . . . as necessary to assure that national air quality standards are achieved." 42 U.S.C. § 7410(a)(2)(C). Modifications not subject to PSD or NNSR requirements may nonetheless be subject to these "minor NSR" requirements.

In 2002, EPA revised the methodology to be used by sources to determine whether a modification is "major" and therefore subject to NSR requirements. *See* Prevention of

Significant Deterioration and Nonattainment New Source Review, 67 Fed. Reg. 80,186 (Dec. 31, 2002) (codified at 40 C.F.R. §§ 51, 52) ("2002 Rule"). Two aspects of the 2002 Rule are relevant to the instant petition. First, the 2002 Rule adopted the "actual-to-projected-actual" methodology, so a "significant emissions increase" is projected to occur if the difference between the source's baseline actual emissions and its projected actual emissions equals or exceeds the significance level for that pollutant. *See, e.g.,* 40 C.F.R. § 52.21(a)(2)(iv)(c). To calculate projected actual emissions, a source "[s]hall consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the State or Federal regulatory authorities, and compliance plans under the approved State Implementation Plan." *See, e.g., id.* § 52.21(b)(41)(ii)(a). This calculation "[s]hall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions." *See, e.g., id.* § 52.21(b)(41)(ii)(b). It "[s]hall exclude . . . any increased utilization due to product demand growth." *See, e.g., id.* § 52.21(b)(41)(ii)(c). Second, the 2002 Rule mandated compliance with its recordkeeping and reporting requirements if a source determined that (1) a modification did not trigger NSR, and (2) there was still a "reasonable possibility" that the modification would result in a "significant emissions increase." *See, e.g., id.* § 52.21(r)(6). The 2002 Rule did not define the term "reasonable possibility."

The court upheld the 2002 Rule's "actual-to-projected-actual" methodology while holding that its "reasonable possibility" standard was arbitrary and capricious. *New York*, 413 F.3d at 10–11, 33–36. The 2002 Rule "allow[ed] sources that take advantage of the 'reasonable possibility' standard to

avoid recordkeeping altogether" without providing any explanation as to how EPA could prove NSR transgressions if sources deciding no reasonable possibility of a significant emissions increase exists kept no data. *Id*. at 35. EPA also failed to explain how, absent such data, reporting requirements of the Act's Title V program and minor NSR programs provided enforcement authorities with the relevant information. *Id*. The court observed that the "intricacies of the actual-to-projected-actual methodology will aggravate the enforcement difficulties stemming from the absence of data." *Id.*

In response to the court's remand, EPA issued a notice of proposed rulemaking and sought comments on two options for defining "reasonable possibility," including its preferred option of using 50 percent of the applicable significance level for a regulated pollutant as the trigger for NSR recordkeeping and reporting requirements. *See* Prevention of Significant Deterioration and Nonattainment New Source Review: Reasonable Possibility in Recordkeeping, 72 Fed. Reg. 10,445, 10,449 (proposed Mar. 8, 2007). Thereafter, upon considering comments, EPA promulgated the final rule. *See* Prevention of Significant Deterioration and Nonattainment New Source Review: Reasonable Possibility in Recordkeeping, 72 Fed. Reg. 72,607 (Dec. 21, 2007) (codified at 40 C.F.R. §§ 51.165, 51.166, 52.21) ("Rule"). The Rule provides that:

> "(vi) A 'reasonable possibility' under paragraph (a)(6) of this section occurs when the owner or operator calculates the project to result in either:
>
>> (A) A projected actual emissions increase of at least 50 percent of the amount that is a 'significant emissions increase,' as defined under paragraph (a)(1)(xxvii) of this section

(without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant; or

(B) A projected actual emissions increase that, added to the amount of emissions excluded under paragraph (a)(1)(xxviii)(B)(3) [emissions attributable to demand growth], sums to at least 50 percent of the amount that is a 'significant emissions increase,' as defined under paragraph (a)(1)(xxvii) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant. For a project for which a reasonable possibility occurs only within the meaning of paragraph (a)(6)(vi)(B) of this section, and not also within the meaning of paragraph (a)(6)(vi)(A) of this section, then provisions (a)(6)(ii) through (v) [reporting requirements] do not apply to the project." *See, e.g.*, 40 C.F.R. § 52.21(r)(6)(vi).

The State of New Jersey timely filed a petition for review with this court and a petition for reconsideration with EPA. In April 2009, EPA agreed to reconsider the Rule, and the court held the petition for review in abeyance pending EPA's reconsideration. EPA took no action on the reconsideration until November 2019, when it informed petitioner that it was no longer reconsidering the Rule. The court lifted abeyance of the petition and therefore proceeds to review of the petition.

## II.

Petitioner essentially contends that the Rule fails to correct the flaws in the 2002 Rule identified in *New York*, 413 F.3d 3. *See* Petitioner Br. 2, 29. Specifically, it maintains that EPA

erred by (1) inadequately accounting for enforcement difficulties stemming from the predictive nature of calculating projected emissions; (2) adopting an arbitrary 50 percent trigger; and (3) failing to explain how authorities could enforce NSR when sources determined that recordkeeping and reporting requirements were not triggered. *See id.* 29–30. EPA disagrees, responding that it satisfied the court's remand direction in *New York*, 413 F.3d 3, and "reasonably balanced environmental enforcement concerns with economic and administrative concerns by establishing a bright-line 50 percent trigger." Respondent Br. 16.

As a threshold matter, intervenors challenge petitioner's Article III standing. EPA does not raise this objection, but the court has an "independent obligation" to review petitioner's standing before addressing the merits. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012). As the party invoking the court's jurisdiction, petitioner bears the burden of establishing its standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and clearly met that burden here.

"To establish Article III standing, a petitioner must demonstrate it has suffered a concrete and particularized injury that is imminent and not conjectural, that was caused by the challenged action, and that is likely to be redressed by a favorable judicial decision." *Texas*, 726 F.3d at 198 (citing *Lujan*, 504 U.S. at 560–61). On direct review of agency action, when standing is not self-evident, a petitioner must "supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review." *Grocery Mfrs. Ass'n*, 693 F.3d at 174 (quoting *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002)). "[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore

9

assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975)); *see also Air All. Houston v. EPA*, 906 F.3d 1049, 1057 (D.C. Cir. 2018). Consequently, the court must assume for purposes of standing that the Rule is arbitrary and capricious because it inadequately accounts for NSR enforcement. Further, petitioner is "entitled to special solicitude" in our standing analysis because it has "quasi-sovereign interests" in reducing air pollution and a procedural right to challenge the Rule under 42 U.S.C. § 7607(b)(1). *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007); *see also North Carolina v. EPA*, 587 F.3d 422, 426 (D.C. Cir. 2009).

Standing is usually self-evident when the petitioner is an object of the challenged government action. *See Lujan*, 504 U.S. at 561–62. Although the Rule itself does not formally regulate petitioner, it directly implicates petitioner's ability to comply with its statutory obligations in administering the NSR program. The Act entrusts states and local governments with the primary responsibility for enforcing NSR requirements. States must include in their SIPs a "program to provide for the enforcement" of NSR provisions. 42 U.S.C. § 7410(a)(2)(C); *see also id*. § 7413(a)(2). Indeed, the preamble acknowledges that the Rule affects states' obligations to implement the NSR scheme. *See* 72 Fed. Reg. at 72,613–14. Identifying those to whom the Rule applies, the preamble specifies that the Rule affects petitioner: "Entities affected by this final rule include major stationary sources in all industry groups . . . Entities affected by the rule also include States, local permitting authorities, and Indian country." *Id.* at 72,608.

Petitioner has identified two injuries, either of which suffices to establish standing to challenge the Rule. Because redressability follows from the court's conclusion about

causation, our inquiry focuses on the injury-in-fact and causation requirements of standing.

First, petitioner maintains that the Rule's inadequate recordkeeping and reporting requirements impair its delegated authority to implement the PSD program for in-state sources. *See* Petitioner Br. 27. In support, it points to the declaration of Danny Wong, Chief of the Bureau of Stationary Sources in the Division of Air Quality of the New Jersey Department of Environmental Protection, stating that absent stricter recordkeeping and reporting requirements, petitioner lacks the resources necessary to ensure that in-state sources comply with PSD requirements. *See* Declaration of Danny Wong in Support of Petitioner's Standing (13 Apr. 2020) at ¶¶ 13–17.

Notably, intervenors do not dispute that the exacerbated administrative costs and burdens imposed by the Rule on petitioner constitute a concrete and particularized injury. *See Clean Wisconsin v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020). Rather, they argue that petitioner's alleged injury is self-inflicted and therefore cannot be fairly traced to the Rule. They rely on *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006), for the proposition that petitioner "could easily require in-state sources to keep the more extensive records sought" because the Act "expressly reserves to states the authority to impose more stringent requirements on stationary sources than the minimum federal requirements, including for recordkeeping." Intervenors Br. 40 (citing 42 U.S.C. § 7416). EPA, in addressing the merits of the petition, echoes intervenors' contention that petitioner's injury is "self-inflicted" and additionally invokes *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976). Respondent Br. 35.

11

Neither case is apposite as the plaintiffs' alleged injuries there stemmed from their own voluntary action or inaction. In *Gonzales*, 468 F.3d at 827–28, the plaintiff's argument that a statute was unconstitutionally vague rested on an alleged conflict between the statute and certain regulations. The court rejected the argument because the plaintiff "ha[d] *chosen* to remain in the lurch" despite having "within its grasp an easy means for alleviating the alleged uncertainty." *Id*. at 831. Plaintiff had failed to inquire as to how the agency proposed to resolve the alleged conflicts or petition the agency under the Administrative Procedure Act to adopt a clarifying rule. *Id*. In *Pennsylvania*, 426 U.S. at 663–64, which concerned the Supreme Court's original jurisdiction as opposed to Article III standing, plaintiff-states that gave their residents credits for taxes paid to other states alleged a loss of revenue due to defendant-states' taxes on nonresidents' income. Because nothing required plaintiff-states to extend the tax credits, the Supreme Court concluded that the "injuries to plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures." *Id*. at 664.

Furthermore, intervenors' argument is contrary to this court's precedent, which has not treated a state's ability to change its laws to evade injury as precluding standing to challenge EPA's actions under the Act. EPA's actions injure states when those actions necessitate changes to state laws and make "the states' task of devising an adequate SIP" "more difficult and onerous." *W. Virginia v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004); *accord Nat'l Ass'n of Clean Air Agencies*, 489 F.3d at 1227–28. Regardless of whether in-state sources "cheat," by forcing petitioner to expend additional resources or change its laws in order to verify sources' calculations and ensure compliance with PSD requirements, the Rule makes petitioner's "task of complying with the Clean Air Act 'more difficult and onerous.'" Dissent at 13 (quoting *W. Virginia*,

362 F.3d at 868). And contrary to intervenors' suggestion that petitioner has an "easy means" to alleviate any harm caused by the Rule, *Gonzales*, 468 F.3d at 831, the preamble to the Rule explains that states wishing to impose more stringent recordkeeping and reporting requirements must still apply for and obtain EPA's approval. *See* 72 Fed. Reg. at 72,614. Moreover, the Supreme Court's decision in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013), reinforces the conclusion that petitioner's injury is not self-inflicted. It too cited *Pennsylvania*, 426 U.S. at 660, and *Gonzales*, 468 F.3d at 831, for the proposition that "respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. But nothing here indicates that petitioner assumed authority to implement the PSD program in order to manufacture standing. To the contrary, EPA delegated that authority to petitioner. Petitioner has therefore established standing based on the asserted harm to its delegated authority to implement the PSD program.

Additionally, petitioner has established standing based on harm to its ability to attain the NAAQS due to unlawful emissions from upwind states. *See* Petitioner Br. 27; *see also* Declaration of Sharon C. Davis in Support of Petitioner's Standing (13 Apr. 2020). A petitioner alleging future injuries "can establish standing by satisfying *either* the 'certainly impending' test *or* the 'substantial risk' test." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 626–27 (D.C. Cir. 2017) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), and other precedent from this circuit); *accord Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). Indeed, this court has "frequently upheld claims of standing based on allegations of a 'substantial risk' of future injury." *Attias*, 865 F.3d at 627. Under that standard, petitioner must show "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial*

probability of harm with that increase taken into account." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (internal citations omitted). The declaration of Sharon C. Davis, Manager of the Bureau of Evaluation and Planning in the Division of Air Quality of the New Jersey Department of Environmental Protection, which accompanied petitioner's opening brief, explains that cross-state emissions contribute significantly to petitioner's ozone levels. *See* Davis Decl. ¶¶ 12–14. It cites EPA findings that westerly or southwesterly air masses moving through the Ohio River Valley or the Great Lakes area carry ozone to the Northeast and that more than 70 percent of a state's ground-level ozone may, on average, be attributable to precursor emissions from upwind states. *Id.* ¶ 14. Such "cross-state emissions from upwind states have prevented New Jersey from coming into attainment of the 2008 ozone NAAQS" despite "aggressive measures to reduce in-state emissions of ozone precursors." *Id.* ¶¶ 15–16. Petitioner has reduced its emissions of ozone precursors by approximately 77 percent from 1990 to 2017, and between 31 percent and 11 percent annually from 2011 to 2017. *Id.* ¶ 15. But high emissions from upwind states jeopardize petitioner's ability to come into compliance with the ozone NAAQS by attainment deadlines in 2021 and 2023 specified by EPA. *Id.* ¶ 16. In other words, increased cross-state emissions substantially increase both the risk and probability of harm to petitioner's ability to attain the ozone NAAQS.

Intervenors and our dissenting colleague nevertheless maintain that petitioner's asserted injury, even if cognizable, cannot be fairly traced to the Rule by an attenuated chain of events based on "assumptions regarding the conduct of unidentified third parties not before the court." Intervenors Br. 37; *see also* Dissent at 12. The uncontested factual statements in the declarations of New Jersey officials notwithstanding, they conclude that petitioner "offers no facts to substantiate its

theory that third parties will illegally emit air pollution as a result of the Rule." Intervenors Br. 39; *see also* Dissent at 2–12. Yet reasonably characterized, petitioner's causal chain involves three links: (1) the Rule's inadequate recordkeeping and reporting requirements make NSR enforcement more difficult in upwind states; (2) inadequate NSR enforcement increases the risk of unlawful cross-state emissions; and (3) such cross-state emissions risk hampering petitioner's efforts to attain and maintain the NAAQS. All are supported by the record.

EPA effectively conceded the first link in the preamble to the Rule: "If ease of enforcement were our only consideration, it would point us toward the most inclusive of recordkeeping and reporting requirements." 72 Fed. Reg. at 72,610. The Davis declaration substantiates the third link, connecting cross-state emissions with petitioner's ability to attain the NAAQS. *See* Davis Decl. ¶¶ 12–16. For the second link, petitioner need not show that out-of-state sources will definitively emit more illegal air pollution. "A permissible theory of standing 'does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties.'" *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 381 (D.C. Cir. 2020) (quoting *Dep't of Commerce*, 139 S. Ct. at 2566). In fact, "an entire line of cases finds redressability, as well as causation, in . . . circumstances turning on third-party conduct that is voluntary but reasonably predictable." *Id*. at 384. "In considering the likely reaction of third parties, we may consider a variety of evidence, including the agency's own factfinding; affidavits submitted by the parties; evidence in the administrative record; arguments firmly rooted in the basic laws of economics; and conclusions in other agency orders and rulemakings." *Id*. at 382 (internal citations and quotation marks omitted).

The record demonstrates that an increased risk of cross-state emissions is the predictable effect of inadequate NSR enforcement. The Rule's premise implies a causal connection between inadequate NSR enforcement and the increased risk of sources emitting unlawful cross-state emissions. The Rule itself requires sources to keep records and report their preconstruction emissions calculations precisely because they might miscalculate them and erroneously evade NSR requirements. *See* 72 Fed. Reg. at 72,610. In the preamble, EPA repeatedly acknowledges that sources underestimate or miscalculate their preconstruction emissions calculations. *See id*. at 72,610–11. The record also features at least nine comments discussing the variability and possibility of error in sources' preconstruction emissions calculations. *See* Response to Comment Document for the PSD and Nonattainment NSR: Reasonable Possibility in Recordkeeping: Final Rule (Dec. 2007), EPA-HQ-OAR-2001-0004-0848, at pp. 19–21 ("Response to Comment Document"). Contrary to our dissenting colleague's characterization, these do not "merely express non-specific, conclusory fears about the rule's enforceability." Dissent at 4. For instance, the National Association of Clean Air Agencies' comment referenced in the dissent cites reports by the National Academy of Public Administration and the Government Accountability Office, as well as congressional testimony of a former EPA Administrator expressing concerns about allowing polluting sources to "self-police" their NSR applicability. *See* Comments of the National Association of Clean Air Agencies (NACAA) (May 7, 2007), EPA-HQ-OAR-2001-0004-0822, at p. 4; *see also Staying Healthy: Health Issues Surrounding Proposed Changes in Clean Air Standards: Hearing on Examining Proposed Improvements to the NSR Program Before the Sub. Comm. on Pub. Health of the S. Comm. on Health*, 107th Cong. 38–39 (2002) (statement of Carol M. Browner, Partner, The Albright Group, LLC, and Former EPA Administrator). Moreover,

petitioner cites examples of NSR litigation actions exemplifying underestimations of emissions calculations by sources. *See* Petitioner Br. 34–36.

Our dissenting colleague would require a "more robust record" of empirical evidence "showing when, where, or how often out-of-state polluters will make major changes that evade the permitting process in a way that dirties New Jersey's air." Dissent at 3, 14. Under well-established standing precedent, however, it suffices to point to "third party conduct that is voluntary but reasonably predictable." *Competitive Enter. Inst.*, 970 F.3d at 384. And under that precedent, petitioner need not produce "empirical study piled on empirical study predicting with specificity . . . how many third parties would injure" it as a "direct result" of the Rule. Dissent at 5. Given petitioner's demonstrated likelihood of out-of-state sources miscalculating their projected emissions, the court may properly accept that the "predictable effect" of inadequate NSR enforcement would be increased illegal cross-state emissions. *Competitive Enter. Inst.*, 970 F.3d at 381 (quoting *Dep't of Commerce*, 139 S. Ct. at 2566). Because the substantial risk of interference with petitioner's ability to maintain the NAAQS fairly traces to the Rule's inadequate recordkeeping and reporting requirements, petitioner has met its burden, once again, to show standing.

## III.

Satisfied of our jurisdiction, we turn to the merits of the petition. The Act authorizes the court to "reverse any [EPA] action found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(a). "A rule is arbitrary and capricious if the agency: (1) 'has relied on factors which Congress has not intended it to consider,' (2) 'entirely failed to consider an

important aspect of the problem,' (3) 'offered an explanation for its decision that runs counter to the evidence before the agency,' or (4) 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *United States Sugar Corp. v. EPA*, 830 F.3d 579, 606 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Our review under the 'arbitrary and capricious' standard is narrow and does not permit us to substitute our policy judgment for that of the Agency." *Maryland v. EPA*, 958 F.3d 1185, 1210 (D.C. Cir. 2020) (quoting *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004)). Applying this deferential standard, the court concludes that petitioner's challenges to the Rule fail.

Petitioner contends that EPA inadequately considered concerns stemming from the predictive and subjective nature of projected emissions calculations. Specifically, it maintains that the "[i]nclusion of demand growth and startup, shutdown, and malfunction elements as well as netting analyses make predicting emissions under the actual-to-projected-actual methodology susceptible to manipulation." Petitioner Br. 34. Petitioner focuses on the Rule's requirement that sources maintain records but not report their preconstruction emissions calculations and post-construction emissions when their projected emissions increase equals or exceeds the 50 percent trigger due to demand growth emissions. *Id*. at 37. Absent independent verification, sources have compelling incentives, petitioner asserts, to apply "unsubstantiated or overly optimistic pre-construction analyses" and evade NSR requirements. *Id*. at 35. In its view, EPA actions following the Rule's promulgation magnify these enforcement concerns. *Id*. at 39–40.

The record, however, demonstrates that EPA adequately considered the enforcement problems referenced by petitioner.

To address concerns about demand growth emissions raised by commenters, including petitioner, EPA modified the proposed rule to trigger recordkeeping requirements when the projected emissions increase added to demand growth emissions equaled or exceeded the 50 percent trigger. *See* 72 Fed. Reg. at 72,609–10. In the preamble to the Rule, EPA reasoned that this "pre-change recordkeeping requirement establishes an adequate paper trail to allow enforcement authorities to evaluate the source's claims concerning what amount of an emissions increase is related to the project and what amount is attributable to demand growth." *Id*. at 72,611. In EPA's opinion, this approach "balances ease of enforcement with avoidance of requirements that would be unnecessary or unduly burdensome on reviewing authorities or the regulated community." *Id*. Petitioner points to no contrary evidence undermining EPA's approach to demand growth emissions.

Petitioner's concerns about netting analyses are likewise unavailing because the Rule excludes netting analyses from projected emissions calculations. *See, e.g.*, 40 C.F.R. § 51.165(a)(6)(vi)(A). Further, EPA offered a reasoned conclusion about why projections of fugitive, startup, or malfunction emissions are not "likely to be significant causes of variability or error that would lead to underestimates of emissions increases from existing units." 72 Fed. Reg. at 72,612. These types of emissions, EPA pointed out, are "included in the project's baseline actual emissions, and [there was] no reason to expect greater amounts of these types of emissions in the post-project projections." *Id*. Nothing in the record contradicts or casts doubt on this reasoning. Enforcement problems stemming from EPA's actions following the Rule's promulgation are beyond the current record for judicial review. 42 U.S.C. § 7607(d)(7)(A).

Petitioner next challenges EPA's choice of the 50 percent trigger. Relying on *Atlas Copco, Inc. v. EPA*, 642 F.2d 458, 465 (D.C. Cir. 1979), it maintains that the Rule remains "completely subjective" and "impermissibly vague": "If a source determines, based on whatever criteria it decides to use, that a 'reasonable possibility' of crossing the 50% threshold does not exist, there is no independent check on that determination." Petitioner Br. 42. The Rule, in fact, gives clear guidance that recordkeeping and reporting requirements apply if the projected emissions increase equals or exceeds 50 percent of a regulated pollutant's numeric significance levels. *See* 72 Fed. Reg. at 72,616–17. NSR regulations codifying the 2002 Rule specify the methodology and criteria to be used to calculate such projected emissions. *See, e.g.,* 40 C.F.R. § 52.21(b)(41). In *New York*, 413 F.3d at 10, 31–32, the court upheld the use of projected emissions as well as the criteria for their calculation. The Rule, therefore, does not amount to a "blanket requirement compelling compliance in the absence of an indication of the factors considered controlling." *Atlas Copco*, 642 F.2d at 465.

Furthermore, EPA offered a rational basis for adopting the 50 percent trigger. An agency "is not required to identify the optimal threshold with pinpoint precision," but required only "to identify the standard and explain its relationship to the underlying regulatory concerns." *WorldCom, Inc. v. FCC*, 238 F.3d 449, 461–62 (D.C. Cir. 2001). In *New York*, 413 F.3d at 34, the court recognized that "less burdensome requirements may well be appropriate for sources with little likelihood of triggering NSR." The preamble to the Rule explains that, in finalizing a bright-line test, EPA "strove for a balance between ease of enforcement and avoidance of requirements that would be unnecessary or unduly burdensome on reviewing authorities or the regulated community." 72 Fed. Reg. at 72,610. In addition to its preferred 50 percent trigger, EPA solicited

comments on other possible values such as 25, 33, 66 or 75 percent. *Id.* at 72,611; *see also id*. at 10,449. Nineteen of the thirty-eight commenters supported a trigger of 50 percent or higher. *See* Response to Comment Document at p. 7. As noted, EPA's final rule accounted for variability in projections due to demand growth emissions and thereby addressed the principal objection of commenters, including petitioner, to the 50 percent trigger. *See* 72 Fed. Reg. at 72,611. EPA explained that commenters' other objections to the 50 percent trigger were "general" and "did not give specific examples of projects for which sources would project emissions increases of less than 50 percent of the significant level but would nevertheless be likely to cause emissions increases above the significant level." *Id*. Petitioner does not identify any contradictory record evidence or objections that EPA failed to consider. In these circumstances, EPA could reasonably determine that the 50 percent trigger "will capture projects that have a higher probability of variability and/or error in projected emissions." *Id*.

Petitioner further challenges EPA's explanation that enforcement authorities may rely on other records — such as Title V records, minor NSR records, state and national emissions inventory records, and business records — to evaluate preconstruction NSR compliance when the Rule's recordkeeping and reporting requirements are not triggered. It principally maintains that such records lack the type of project-specific, preconstruction information needed to evaluate NSR compliance. It also maintains that EPA failed to explain how enforcement authorities may draw on these records collectively to trace emissions increases to specific modifications. Even assuming for the purposes of argument that non-NSR specific records are poor substitutes, petitioner fails to show how EPA acted arbitrarily or capriciously. It cites no authority to support the proposition that EPA had an obligation to show that its

"reasonable possibility" standard achieves "perfect NSR compliance." *New York*, 413 F.3d at 44 (Williams J., concurring). Rather, EPA's obligation was "to analyze the trade-off between compliance improvement and the burdens of data collection and reporting" and "articulate a reasoned judgment as to why any proposed additional burden would not be justifiable in terms of the likely enhancement of compliance." *Id.* By adequately considering NSR enforcement concerns raised during this rulemaking and offering a reasoned explanation for its 50 percent trigger, EPA satisfied this obligation. On this record, petitioner otherwise fails to show that EPA's action was arbitrary or capricious.

Accordingly, we deny the petition for review.

WALKER, *Circuit Judge*, dissenting: New Jersey claims the EPA promulgated an arbitrary and capricious rule. For the reasons explained in the Court's thoughtful opinion, New Jersey's argument lacks merit. But rather than reaching the merits, I would, with respect, dismiss New Jersey's petition for lack of Article III standing.[1] New Jersey has not shown the EPA caused it to "suffer[] an injury in fact . . . that is fairly traceable" to the EPA's rule.[2]

\* \* \*

A command by the Clean Air Act requires large-scale emitters of air pollutants to get permits when they make certain changes to their facilities.[3] The permit process is triggered by changes that are "major."[4] New Jersey argues the EPA should impose stricter record-keeping and reporting requirements on out-of-state polluters who aren't making changes that are expected to be "major" or have a "reasonable possibility"[5] of requiring a permit. New Jersey's theory of standing goes like this:

1. In the future, some out-of-state companies will desire a change that has a "reasonable possibility" of triggering the permit process.

2. Maybe one of those companies would not receive a permit if it applied for one.

3. So maybe that company will avoid triggering the permitting process by underestimating its expected emissions.

---

[1] U.S. CONST. art. III, § 2.
[2] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).
[3] *See* 42 U.S.C. § 7475.
[4] *See* 40 C.F.R. § 52.21(a)(2)(iii).
[5] *Id*. § 52.21(r)(6).

4. Maybe the company's change ends up being major.

5. Maybe the EPA will not detect that deception (or unintentional miscalculation) because the company didn't have to keep any records.

6. Maybe the pollution caused by the undetected major change will reach New Jersey.

In other words, pollution *might* reach New Jersey from a company that *might* have hidden a major change's pollution from the EPA, which *might* have denied a permit for the major change that *might* have gone undetected.

For the sake of argument, I will assume that *if* that happens, New Jersey will be injured in two ways. First, its citizens will breathe dirtier air. Second, it will be harder for New Jersey to meet its obligations under the Clean Air Act.[6]

In addition, I will assume that most of steps one through six will happen. For example, with regard to step six, the record shows that about 70% of New Jersey's ozone is made up of air pollutants from other states.[7] So if sources close to New Jersey make major changes that would not be permitted, and if they avoid detection because of the rule, those illegal emissions will end up harming New Jersey.

However, I cannot assume, and New Jersey has not shown, that the third step above — the EPA's rule will cause injurious underreporting of undetected major changes — is a

---

[6] *See* 42 U.S.C. §§ 7409-7410.
[7] Davis Decl. at ¶ 14.

"certain[ty],"[8] a "predictable effect,"[9] or a "substantial risk."[10] Even though courts owe states "special solicitude"[11] in EPA emissions cases, this solicitude doesn't cover unknown injuries inflicted by unknown companies at some unknown time in the possibly distant future.[12]

Perhaps New Jersey could have established in the record that the "likely reaction" of sources to the rule will be to underestimate expected emissions to avoid detection.[13] But that's not this record. New Jersey has directed us to no evidence in the record showing when, where, or how often out-of-state polluters will make major changes that evade the permitting process in a way that dirties New Jersey's air.

Instead, New Jersey has provided us with only a couple declarations, about a dozen comments, the rule's preamble, and the purpose of the rule. But the declarations are long on conclusory statements and data about how much pollution from upwind states reaches New Jersey, and short on how much of

---

[8] *Clapper v. Amnesty International USA*, 568 U.S. 398, 410 (2013).

[9] *Competitive Enterprise Institute v. FCC*, 970 F.3d 372, 381 (D.C. Cir. 2020) (quoting *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019)).

[10] *Food & Water Watch, Inc., v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)); *cf. Public Citizen, Inc. v. National Highway Traffic Safety Administration*, 489 F.3d 1279, 1298 (D.C. Cir. 2007) ("[W]ere all purely speculative increased risks deemed injurious, the entire requirement of actual or imminent injury would be rendered moot, because all hypothesized, nonimminent injuries could be dressed up as increased risk of future injury.") (cleaned up).

[11] *Massachusetts v. EPA,* 549 U.S. 497, 520 (2007).

[12] *Clapper*, 568 U.S. at 409 (an "injury must be certainly impending") (cleaned up); *id.* (a "possible future injury" is "not sufficient") (cleaned up).

[13] *Competitive Enterprise Institute*, 970 F.3d at 382.

that pollution comes from major changes that will go undetected absent a stricter rule.[14] Those declarations include no firsthand knowledge or empirical evidence of major changes that will be detected only under a stricter rule.

New Jersey's other sources help it even less. The rule's preamble includes no data relevant to Article III standing. And the relevant comments merely express non-specific, conclusory fears about the rule's enforceability.[15] Again, they don't contain empirical data or firsthand accounts alleging when, where, or whether out-of-state polluters will make major changes that evade the permitting process.

As for the rule's purpose of preventing malfeasance and miscalculations, that's not enough either. Some rules can be prophylactic. Others are senseless. A rule's mere existence does not mean it is actually solving a problem that is injuring anyone.

In contrast, in *Department of Commerce v. New York* — where plaintiffs had standing because a federal policy's predictable effect on third parties would be an increase in the third parties' illegal refusal to submit census forms, thereby injuring the plaintiffs — the district court record was

---

[14] *See* Davis Decl. at ¶ 20 ("Sources in upwind states may be emitting air pollutants at levels that would necessitate [a permit] . . . ."); *see also* Wong Decl. at ¶ 6 ("New Jersey is harmed by the possibility of unlawful emissions from sources in states upwind of New Jersey . . . .").

[15] *See* Comments of the National Association of Clean Air Agencies (May 7, 2007), at 2 (The rule "is likely to result in diminished . . . compliance.").

voluminous.[16] It included empirical study piled on empirical study predicting with specificity — down to the tenth of a percentage point — how many third parties would injure the plaintiffs as a direct result of the agency's decision to ask census respondents whether they were citizens.[17] And the district court's (179-page) opinion made factual findings based on extensive evidence unlike anything in the administrative record here.

I will quote those factual findings at length in order to illustrate their specificity and thoroughness:

191. The Census Bureau's conclusions are spelled out in three memoranda. First, the Census Bureau's December 22 Memo summarized evidence that a citizenship question would cause a then-estimated 5.1% decline in self-response rates among noncitizens. *See* December 22 Memo, at AR 11639-40. It noted that "this evidence is consistent with citizenship questions being more sensitive for household with noncitizens," *id.* at AR 11640, a fact that is not in dispute, *see* PX-297 at RFA 70.

192. Second, the Census Bureau's January 19 Memo similarly concluded that addition of a citizenship question would reduce self-response rates. *See* January 19 Memo, at AR 1280. The Memo summarized "[t]hree distinct analyses" that "support the conclusion of an adverse impact on self-response" caused by the addition of a citizenship question. *Id.*

---

[16] 139 S. Ct. 2551; *see New York v. Department of Commerce*, 351 F. Supp. 3d 502, 622-25 (S.D.N.Y.), *affirmed in part, reversed in part*, 139 S. Ct. 2551 (2019).
[17] 351 F. Supp. 3d at 578-81.

First, data show that, on the ACS survey, Hispanic households are disproportionately less likely to respond to the citizenship question, whether responding by mail or online. *Id.* Second, a comparison of self-response rates for the 2000 census's long-form census questionnaire (which included a citizenship question) and its short-form census questionnaire (which did not) revealed that noncitizen households were 3.3% less likely than all-citizen households to respond to the long-form questionnaire. *Id.* A similar comparison of 2010 census self-response rates to 2010 ACS self-response rates (the latter of which included a citizenship question) produced a similar result: Noncitizen households were 5.1% less likely than all-citizen households to respond to the survey containing a citizenship question. *See id.* Based on these comparisons, the Memo noted, it was a "reasonable inference that a question on citizenship would lead to some decline in overall self-response" and "a larger decline in self-response for noncitizen households." *Id.* at AR 1281. Finally, the Memo analyzed the "breakoff rates" (the rate at which a respondent stops responding to the survey when he or she comes to a particular question) on the 2016 ACS internet survey. Those rates indicated that Hispanics were disproportionately likely to "breakoff" in their responses when they came to the citizenship question. *See id*.

193. Third, a comprehensive study by Census Bureau staff published on August 6, 2018 and referred to at trial as the Brown Memo (so named for its lead author) consolidated the existing data on the impact of a citizenship question. The Brown Memo also

concluded that a citizenship question would disproportionately reduce noncitizens' self-response rates. *See* Brown Memo at 1, 54. The Brown Memo presented data illustrating that Hispanics and noncitizens are disproportionately unlikely to respond to a citizenship question. *See id.* at 7-9. The data also showed that those subpopulations became even less likely to respond to a citizenship question during the middle of this decade. *See id.* at 9-10 ("[T]hat sensitivity has increased in recent years.").

194.  Whereas the January 19 Memo had predicted that addition of the citizenship question would cause a 5.1% differential decline in noncitizen household self-response rates, *see* January 19 Memo, at AR 1280, the Brown Memo updated that figure to 5.8% on the basis of more recent data, *see* Brown Memo at 39. Notably, it emphasized that the 5.8% estimate was still "conservative." *Id.*; *see also* Tr. 900-01. It was conservative, the Memo explained, because the analysis supporting the estimate relied on ACS data, and the effect of a citizenship question on the ACS may have been muted by its presence among the large number of questions. *See* Brown Memo at 39; *see also* Tr. 87, 89, 901-02. A citizenship question on the shorter 2020 census questionnaire "will be more visible" and thus likely to produce a more pronounced effect. Brown Memo at 39. And changes in the macroenvironment since the ACS data was collected, including a higher "level of concern about using citizenship data for enforcement purposes," could also exacerbate the effects of adding a citizenship question. *Id.*

195. Separate and apart from its effects on self-response rates among noncitizen households, the Brown Memo supports the conclusion that adding a citizenship question to the 2020 census will disproportionately depress self-response rates among Hispanic households (some, but not all, of which are also noncitizen households). The Brown Memo showed that Hispanics were more than twice as likely as non-Hispanic whites to skip the citizenship question on the ACS and that the differential in such item nonresponse rates increased between 2013 and 2016. *Id.* at 8-10. Other ACS questions did not produce the same differential effects. *See id.* And the Memo found that the citizenship-question breakoff rate for Hispanics on the ACS was eight times higher than the breakoff rate for non-Hispanic whites. *See id.* at 10; *accord* January 19 Memo, at AR 1281.

196. As the Census Bureau has observed, this differential breakoff effect is growing. The breakoff rate among Hispanics for the 2017 ACS citizenship question (which was not available in time to be incorporated into the Brown Memo's analysis) was *twelve* times higher than the breakoff rate for non-Hispanic whites. *See* AR 12757-62; Tr. 916. Moreover, the breakoff rate for Hispanics, but not for non-Hispanic whites, increased between 2016 and 2017 — suggesting that the effects of a citizenship question on Hispanic self-responses have been "increas[ing]." AR 12757-62; Tr. 916-17. The Census Bureau believes that "Hispanics are more sensitive to survey questions about citizenship than they were a few years ago"; non-Hispanic whites "are not." Census Bureau 30(b)(6) Dep. 366-69.

197. Defendants' expert, Dr. Abowd, credibly testified to the soundness of the Census Bureau's analyses and conclusion that adding a citizenship question to the 2020 census would result in a differential decline in self-response rates among noncitizen households. With regard to methodology, Dr. Abowd testified not only that the Brown Memo was "methodologically appropriate," but also that it "constitutes the best analysis that the Census Bureau can do of the consequences of adding the citizenship question to the 2020 census" given the available data. Tr. 897. With regard to conclusions, Dr. Abowd testified that both he and the Census Bureau agreed that adding a citizenship question to the 2020 census would lead to a lower self-response rate among noncitizen households. *See id.* at 881-82. Finally, Dr. Abowd agreed that "[t]he bulk of the evidence suggests that the citizenship question is likely to be responsible for the decline in self-response," and that 5.8% was a "conservative estimate" of the likely differential decline in self-response rates among noncitizen households if a citizenship question were added to the 2020 census questionnaire. *Id.* at 1352, 900-02.

198. Dr. Abowd testified that considerations beyond those mentioned in the Brown Memo further supported the view that the 5.8% estimate was "conservative." *See id.* at 944. For instance, he referred to the Census Bureau's Census Barriers, Attitudes, and Motivators Survey ("CBAMS"). *See id.*; PX-662. The CBAMS found that, in 2018, only 67% of people said they were likely to respond to the 2020 census, as compared to the 86% who had said in

2008 they were likely to respond to the 2010 census. *See* PX-662, at 12. It noted that "[t]he citizenship question may be a major barrier" in part because people believed that the census's "purpose is to find undocumented immigrants." *Id.* at 43. Dr. Abowd testified that the increase in sensitivity to a citizenship question reflected in the CBAMS study "would not be captured in the 5.8 percentage point estimate that is based on data only up through 2016." Tr. 944-45; *see also id.* at 902, 916-17.

199. Testimony from at least three of Plaintiffs' expert witnesses bolsters the Census Bureau's and Dr. Abowd's conclusions about self-response rates. First, Dr. D. Sunshine Hillygus credibly and reliably testified that "noncitizens and Hispanics are differentially concerned about the confidentiality of a citizenship question" and, thus, "would be less likely to participate" in a survey that includes such a question. *See id.* at 50-51; *see also id.* at 57-58. She noted that this concern has increased in the last few years. *Id.* at 51-53. Notably, Dr. Hillygus testified that a citizenship question would be likely to affect the response rates of all Hispanics, "regardless of their own immigration or citizenship status." *Id.* at 51-52, 1404; *see also* PX-152; PX-662; PX-663. That testimony is supported by evidence showing that Hispanics who are citizens are disproportionately hesitant to engage with the government by seeking food stamps or health care out of fear that a family member could be deported. *See* Tr. 52-54, 57, 85-86.

200. Second, Dr. Matthew Barreto, "an expert in survey methodology, public opinion polling, and racial and ethnic politics," credibly testified that "the

addition of a citizenship question . . . in today's macro environment would result in reduced participation in Latino and immigrant communities in 2020." *Id.* at 589, 620-21. He based this conclusion on a review of existing social science literature and on the results of a public opinion survey that he designed and conducted. *See id.* at 620, 643-44. On the basis of that evidence, Dr. Barreto credibly concluded that Hispanic households would be substantially less willing to participate in the census if there were a citizenship question, regardless of whether they were given assurances that their responses would be kept confidential. Tr. 682-85; *see also* PX-670.

201. Third, Dr. Jennifer L. Van Hook's expert analysis of 2017 ACS data demonstrates that nonresponse to the ACS citizenship question has continued to increase among Hispanics relative to other subgroups since 2013. *See* Docket No. 489-3 ("Van Hook Decl."), ¶¶ 69-71. By contrast, there has not been a significant increase in nonresponse rates for the citizenship question for other racial groups. *See id.* ¶ 70. On an absolute basis, nonresponse rates for the citizenship question for Hispanics have also increased since 2013. *See id.* ¶¶ 72-73.[18]

If *our* record looked like *that* record, then we could say "the predictable effect of [the EPA's rule] on the decisions of [polluters]" is an increase in illegal pollution significant enough to implicate Article III standing.[19] This is not to say

---

[18] *Id*.

[19] *Competitive Enterprise Institute*, 970 F.3d at 381 (quoting *Department of Commerce*, 139 S. Ct. at 2566).

standing requires *as much* evidence as in *Department of Commerce v. New York*. But the difference between there and here is the difference between a ton of apples and an ounce of an orange.

For that reason, this case is much more like *Clapper*[20] (no standing) than *Massachusetts v. EPA*[21] (standing). Just as the alleged injury in *Clapper* was "too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending,'" New Jersey has not alleged "actual knowledge" that, because of the challenged rule, a particular source upwind has emitted or "certainly" will emit more pollution than the EPA's emissions standards allow.[22] Nor has it demonstrated a "substantial risk" of that pollution.[23] It instead relies on an "attenuated chain of possibilities"[24] and "on speculation about the unfettered choices made by independent actors not before the court."[25]

In contrast, in *Massachusetts v. EPA*, there was no question about the exact sources of pollution. *All* cars were injuring the state in a specific way (by emitting carbon that reduced the state's coastline).[26] But here, because some large-scale polluters accurately disclose their pollution without stricter monitoring and record-keeping requirements, New Jersey doesn't know which (if any) out-of-state polluter is injuring it.

---

[20] 568 U.S. at 422.

[21] 549 U.S. at 525.

[22] *Clapper*, 568 U.S. at 401 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *id.* at 410-11.

[23] *Food & Water Watch, Inc.*, 808 F.3d at 914.

[24] *Clapper*, 568 U.S. at 410.

[25] *Id.* at 414 n.5 (cleaned up).

[26] 549 U.S. at 521-23.

13

\*     \*     \*

New Jersey also claims it's injured by the EPA's lax record-keeping requirements for *in-state* polluters. According to New Jersey, the EPA's rule makes it harder for the state to comply with its permitting obligations under the Clean Air Act.[27] And here again, I agree with New Jersey that *if* the EPA's rule makes its task of complying with the Clean Air Act "more difficult and onerous," then it has standing.[28]

But as with out-of-state polluters, that "if" depends on whether in-state polluters will cheat. And New Jersey's prediction of in-state cheating is no less speculative than its prediction of out-of-state cheating.[29]

I do not read *West Virginia v. EPA* to alter that analysis. There, the EPA's policy limited the choices available to the petitioner states.[30] Absent the EPA's policy, those states would have been free to adopt regulatory regimes more desirable to them than what was possible under the EPA's policy.[31] Here, in contrast, the EPA's rule does not make New Jersey's compliance with the Clean Air Act any more difficult *unless* we accept New Jersey's speculation about polluters cheating — which brings us back to where we started.[32]

To be sure, if New Jersey believes what it says — that the EPA's rule goes too easy on polluters — then New Jersey may well decide down the road to impose additional requirements on in-state polluters. But absent a record containing more

---

[27] *See* 42 U.S.C. § 7410(a)(2).

[28] *West Virginia v. EPA*, 362 F.3d 861, 868 (D.C. Cir. 2004).

[29] *See infra* pp. 1-12.

[30] 362 F.3d at 868.

[31] *Id.*

[32] *See infra* pp. 1-12.

specific evidence than what we have here, New Jersey's decision will be based on the state's best guess about the effect of those additional requirements — the type of speculation that is often enough for legislators, but not enough for courts applying the elements of Article III standing.

\* \* \*

Absent a more robust record, New Jersey's predictions of pollution from illegal major changes traceable to the EPA's monitoring and recordkeeping requirements are "conjectural" and "hypothetical."[33] The record does not show the challenged rule's "predictable effect" will be major changes that cause illegal pollution.[34] I respectfully disagree with the Court's conclusion to the contrary.

---

[33] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).
[34] *Competitive Enterprise Institute*, 970 F.3d at 381 (quoting *Department of Commerce*, 139 S. Ct. at 2566).